Would the lawyers who are going to orally argue step up and identify yourselves for the record, please? Good afternoon, Your Honor. I'm Timothy Storm on behalf of the Plaintiffs' Appellants. Good afternoon, Your Honor. I'm King Poore on behalf of the Charities. Okay, and do we have somebody here from the bank? Good afternoon, Your Honor. John Brooks on behalf of the First National Bank. Richard Hussack, the Attorney General's Office. Oh, the AG. That's right. I forgot about you folks. You're involved in this, too. Are you all three going to argue? We are, Your Honor. Have you decided how you're going to split up your total of 15 minutes? I believe the... Five, five, and five? Well, the order allotted 10 minutes to the charities, and we would like to have the Attorney General have two of those minutes, and then the order also allotted 10 minutes to the bank. We're not going to cut you off in mid-sentence, so don't worry about that. But just keep an eye on the clock as you proceed, okay? Right, Your Honor. And you, Counsel, have 15, and you can reserve your... I would assume you'd like to reserve your response time until all three of these folks have spoken, right? Correct, Your Honor. Fine. And we'll give you a little additional time, too, because you're being ganged up on by three very able lawyers. But you look pretty able yourself, so... Your Honor, there was one further issue related to fees that you allotted five minutes to, I suppose. Why don't you incorporate that into your argument, okay? Just segue, segue into the... Yes, segue into the bank's fee argument right from... I think we can follow you, okay?  Finally, Your Honor, I assume that the Court would like the charities to go first and then the bank. Yeah, probably. It's the logical thing to do, it seems. Thank you. Okay. May it please the Court, I'd like to reserve five minutes of my time for rebuttal, if I may, Your Honor. Yes, you may. There are two fundamental issues in this case. The first is whether Marie Bisturski intended to amend her trust to leave her assets to her nephews, in this case her grandnephews, the Hurleys. And secondly, whether she actually accomplished that amendment prior to her death. There's a third related issue, which is if the document that Marie Bisturski signed and approved before her death is not a valid trust amendment, is the trustee of the Bisturski Trust, the bank, responsible for the consequences of that failure to amend the trust? I ask the first question, Marie Bisturski's intent. The most basic principle of trust construction is to carry out the intent of the settler. Here, on the record, we can see that Bisturski stated over and over again that she wanted the bulk of her estate to go to the Hurleys, who were her grandnephews. The Charities and the Circuit Court both expressed reservations as to whether we can really know whether Bisturski intended the Hurleys be the beneficiaries or some other nephew or some other people, whether she was really talking about the Hurleys or whether she may have changed her mind. But all of that is speculation and unsupported suggestion. The record shows that Bisturski informed her lawyer and the trustee, bank, that she wanted her assets to go to the Hurleys. She said that not once, but more than once. Her assets were the bulk of her assets. The bulk of her assets to go to the Hurleys. And there is nothing contradictory that she said in the record. She never mentioned any other relatives or any other intent or disposition during the relevant time period that we're talking about. I mean, is that enough bulk of assets so we know what that means? Bulk of assets? Well, we know this. Let me just answer my question. Do we know what bulk of assets means? Do we know exactly how much she wanted to give the boys? On the document that she signed, the May 13th document, it says these assets will go to her nephews. These assets are reflected on that document as being... Hold on. Wait a while. I've got this May 13th document in front of me. Incidentally, the May 13th document wasn't prepared by the bank, was it? It was not typed by the bank. Let's not split hairs. It wasn't prepared by the bank. It might have been prepared at the bank's direction. Okay. I'll grant you that. But it wasn't prepared by the bank. That's correct. Okay. And you're suggesting all along, and I think the trial court actually accepted the possibility that this could be a legitimate amendment to the trust if it had been properly prepared. Okay? Okay. I look at it, and what I see is an asset allocation suggestion by a portfolio advisor. Correct. That is on this document. So it could be both an asset allocation suggestion by a portfolio advisor and an amendment to the trust. Oh, it can and it is, because the asset allocation suggestion by the portfolio advisor is how the document began. But then it was presented... I think that's how it began and ended, as it turned out, right? Well, I disagree with that, Your Honor, because it was presented to Marie Wisterski by the bank. And they said whatever they said to her and put... What did she approve? What did she approve? Well, she approved everything that's on this page. She approved reallocating three kinds of assets. Correct. She was cash-heavy, according to this particular thing. And then whoever prepared this said, you've got too much cash. What you really need to do is to reduce your cash and increase your holdings in bonds and stocks. Well, that was not just what this advisor said, by the way. That's what Marie Wisterski wanted and the reason she transferred the assets. Now, how do you tease out of that? First of all, you've got to rely almost completely on that one sentence at the beginning. Underneath approved, it says, we understand this trust is for the benefit of Maria. These assets will eventually go to her nephews. Correct. Eventually go to her nephews. By virtue of this document? Does it say that? Does it say what you just read? Yes. It will eventually go to her nephews by virtue of this document? This document hasn't done anything yet. It's been approved for reallocation. Do we know, incidentally, whether that reallocation occurred? I believe it did occur. I don't know that it occurred exactly as it says in this document. There was a reallocation. But this document does that and it also does something else that's very important, Your Honor. What's that? It completely complies with the trust requirement for amending the trust. How does it do that? Well, under the trust, there's only one simple thing that's required. A writing. I'm sorry? A writing. It has to be a writing. A writing delivered to the trustee. Not even any signature required. But in this case, Marie Wisterski did even more than the trust requires. She signed this. Counsel, I believe it was imaginative wiring, but this is some of the most imaginative wiring I've ever seen, where you've taken what is nothing more than the Inman Security Group's recommendation for asset reallocation, which goes on every day of the week, and because she approved this asset reallocation and it contains a reference to the fact that these assets will eventually go to her nephews, that it's operative as an amendment to the trust if the bank had filed it, I guess. But it's not by imagination. It is in compliance with the trust requirements. Well, I want to ask you about the word nephews. How are we going to translate that for you from nephew to grandnephew? If one accepts that this is a trust amendment and we're now looking at an interpretation of the trust amendment, the law is very clear that if there is a need to interpret a trust amendment with an ambiguous term, you look at the circumstances surrounding the execution. The circumstances in this case are that the nephews she wanted the assets to go to are the Hurleys. There is nobody else in the record that she ever said She did leave money to her two other nephews. Right. Not this money. Not this money. Specific requests to those nephews. And that was the entire point of her saying, I want the other assets to go to my nephews, the Hurleys. She didn't refer to them as her grandnephews. Certainly, I wish that this document had. It would have been much clearer. But under all of the circumstances, nobody has brought forth any evidence saying that there's an ambiguity that she might have wanted the assets to go to these other nephews. Is there an ambiguity in this document in that it says that the Feldman Securities Group understands that the trust is for the benefit of Maria? That's their understanding as opposed to anything about the settler? Oh, if the document stood by itself and there weren't a giant approved stamp with Marie's signature on it, I think there might be a question about that. But there is a giant approved stamp. How about the fact that the approved is above and not at the end of the document? I think that has nothing to do with anything, frankly, because we have to look at what the trust says are the amendment requirements. And we may not like the way this document looks. It may not be a document that I would have prepared or that Ms. Psterski's former lawyer would have prepared. But what the law tells us is, Whitaker v. Staples, for example, if the amendment complies with the trust's requirements for amendment, it is an amendment. The court concluded, though, that she had to follow case law, and she interpreted that case law as saying that this document has to be created by an attorney. A trial judge question. What's our standard of review here for the trial judge's ruling, incidentally? This particular issue is a summary judgment. It's a noble standard of review. So the fact that the trial judge in this particular case saw this as a possible amending document, conforming document, but for the fact that it was not prepared by a lawyer, we don't really have to buy into that, do we? No, you don't have to buy into that. No, but she said in addition to it not complying with the statute, that she said it did not meet any suggestion that this was an amendment to the trust, that the document is not precise. It has nothing in it that really tells anyone what it's supposed to do to amend the trust to effectuate her goal or purpose. I think there are sort of two things going on in what Your Honor is talking about with respect to what the trial court said. One is the threshold issue. Does it comply with the requirement for amendment of the trust document? I don't think the trial judge was so concerned about that. I think the second issue you're dealing with, which is if we assume for argument's sake that it is a trust amendment, is it precise enough to tell us what the settlor wanted to do with her assets? Now, in this particular case, again, it's not a beautiful legal document that I would be prepared to put my name on and be happy about, but the fact of the matter is it's more specific than most trust amendments are. It says right there what her assets are. Well, it's not like any of her other amendments, that's for sure. Certainly not. I don't see what trust allocation documents, portfolio allocation suggestions. First of all, you can move stuff around in the portfolio without amending the trust, as you know. Yes. You can simply take the cash, buy bonds, and buy stocks, okay? You don't have to amend the trust in order to do that. She's approved this specific document for trust allocation. But it also says who will get the assets. We can't edit and blue pencil what this document says. Right, it says the nephews. It says the nephews. And that's sufficient enough, you say, do we need parole evidence to find out that the nephews are your clients? We don't have any other evidence to the contrary. But it's parole evidence, isn't it? It is parole evidence, but I didn't raise the issue of whether it's specific enough. The other side has raised that. So if they're saying that this is an ambiguity in the trust document, and they want to then look outside the trust document to determine what nephews really means, where's their evidence that it means anything other than Hurley? I detect a subtle transfer of the burden of proof, but that's okay. That's what good lawyers do. Well, Your Honor, I don't intend to transfer the burden of proof. I'll give you my second phrase. I can give you a pile of evidence that it's the Hurleys and only the Hurleys. Have you withdrawn any reliance on the bedside note? Well, the bedside note is not a trust amendment in the sense that it was not delivered to the trustee. So you raise it as parole for interpreting this document? Well, the bedside note is not inconsistent with this document, but the bedside note is not necessary. At the beginning, I was not involved in the case of the trial court, but in the beginning the Hurleys didn't know about the May 13th document. All they knew about was, number one, she intended to leave them the money, and number two, there was this so-called bedside note. Okay. It was only after they found the May 13th document that we now have an actual legitimate trust amendment. Okay. Your Honor referred to the second issue in this first issue that the trial court was concerned about, which is, of course, Section 2BD of the Consumer Product Act. Right. That's what the trial court primarily relied on. It is. It is, Your Honor. And the trial court relied on that statute as interpreted by the Lanphier case. Now, we've argued extensively in the briefs as to why Section 2BD does not apply, but I think it's worth emphasizing a couple of those points because of the discussion we've had up until now. They've relied tremendously on the fact that the document was not actually typed by the bank or someone employed by the bank. But that's not true. The fact is that in most cases, one would never even know who typed a particular trust amendment. This one conveniently says Feldman Securities on the top of it, but if it had been Jones Secretarial Services, we wouldn't know that, and yet it wouldn't be a document that was prepared by the bank. It would be a document that was prepared by someone other than the bank. What's important here is the May 13th document was presented to Hurley by a representative of the bank. He stamped approved on that document, asked her to sign it, and she did. There's no indication that she interrogated the bank officer about where this document came from, how it was typed, how it was prepared. But the fact that it was presented to her and, in effect, endorsed by the bank, takes it outside of the Section 2BB prohibition and into the exception because banks are permitted to prepare this type of document. Do you have a case that holds that? There's only one case that interprets this section, Your Honor, and that's Landhier. I'm hoping to get a case that holds that very shortly. But in order to do that, we're going to have to buy into your argument. This particular document can be, but for the possible defect in who prepared it, legitimately considered to be an amendment to the trust. That is correct, Your Honor. Okay. No, I understand your position, I think. I just want to make sure I understand. That is the position that we have in this situation because this is the- So is it your position that Marie could amend the trust? Correct. Her nephews could amend the trust? No. Marie and who else? Marie. Okay. So this was Marie's amendment? Correct. Marie was the settler of the trust who was empowered to amend the living trust. The bank couldn't amend it? Unilaterally, no. And these assets referred to under the paragraph that reads account information, these assets will eventually go to her nephews. That means the charities are cut out completely, right? As to the assets that are listed on that page- Well, are there any other assets? Are there any others? I don't know. These are the only ones. Of course, the Feldman Investment Form doesn't say that it's an amendment to the trust. I'm sorry, could you repeat that? The Feldman Investment Form document we're talking about, it doesn't say that it's an amendment to the trust, does it? No. There is no word printed on that document that it's an amendment to the trust. Would you agree that normally when you amend the trust, the document says that it's an amendment to the trust? Absolutely. That would be the normal and, I believe, the proper approach. But what's important, frankly, is not what I believe about amendments to the trust. It's what the trust says about amendments to the trust. And this document complies. I know we've prod that ground. No, your brief is very clear as to what your position is. It's a very able brief, very well presented, and I think we understand your position. Anything else you want to add? Because we really need to keep moving along here. We've got three other people we have to hear from. Go ahead. I'd like to move to the issue with respect to the bank, if I may, which is our final issue. The alternative issue is that if this isn't a legitimate document, it was a document that is evidence clearly that the bank was supposed to prepare. Was supposed to see that an amendment was prepared. Was prepared. Or in some way accomplished. They reached their fiduciary duty to their client by not having that document prepared. That's absolutely correct. Do you have any authority to that effect? To specifically what effect, Your Honor? To that proposition, that they had a duty to prepare this document. But if a bank officer says, I'll take care of it, that's all you really need, right? No, no, that's not exactly our position. But here's my authority, Your Honor. The bank's portion of the case was terminated based upon the bank's motion to dismiss. Motion to dismiss the second amended complaint. The authority as to what the bank's obligation was. Let's get to the precise reason it was dismissed, first of all. Yes. And what was the precise reason she dismissed it? Well, there were several reasons she dismissed it. The first reason she dismissed it had to do with the purported judicial admissions arising from the first amendment. From the verified first amendment. Had you actually changed your position? In what respect, Your Honor? In the second amended complaint that you changed. Oh, that was the court determined that our position had to be. Yeah, I understand that. But that's not accurate either. And here's what's happening with respect to that part of this. First, the issue of whether Mr. Boyla, who had been Ms. Kasturski's attorney before, remained her attorney or became her attorney or was her attorney for particular purposes, are conclusions of law. They are not allegations of fact. So in any event, they couldn't be judicial admissions. Judicial admissions apply, as you well know, only to matters of fact that are completely within the knowledge of the pleader. But beyond that, all of this business about whether Mr. Boylan was originally retained for one purpose or another purpose or a range of purposes doesn't make any difference. Because what has been clear throughout any complaints you want to look at is, by the time May 2002 rolled around, when this amendment occurred, Mr. Boylan was not in the picture any longer. We don't know why. But what we do know is he wasn't there because there is no allegation of these complaints that he was there or that he had an obligation at that time. And aside from the complaints, I find this very interesting. The bank is arguing that Mr. Boylan was retained as Ms. Kasturski's attorney, apparently for all purposes and for all time, and therefore nobody else could have any duties to Ms. Kasturski. Well, if the bank was so certain that Mr. Boylan was Ms. Kasturski's attorney in May 2002, why was it that the bank at that time did not inform Mr. Boylan that it had finally received the trust assets from the prior trustee and that Mr. Boylan could go forward with the amendment to the trust? It didn't do that. And the reason it didn't do that is reflected in the allegations of the first amended complaint and more clearly in the allegations of the second amended complaint, which is by that time the bank was in full control. And we have Mr. Joyce, the bank's representative, telling Ms. Kasturski, according to paragraph 19 of the second amended complaint, that he would take all steps necessary. We know the facts, but the question really is where is this duty on the bank? Where does it come from? It comes from two things. Number one, the bank is Ms. Kasturski's fiduciary by virtue of being the trustee of the trust. Two, as her fiduciary, the bank specifically told Ms. Kasturski that it would assure that the amendments that she had undeniably expressed to the bank were her intention would be made to the trust. The bank undertook that duty. Unambiguous. Let's rewind the film now and assume that she was wrong in dismissing the second amended complaint. And we remanded to the trial court to reinstate the second amended complaint. Then what are you going to do? Well, I'm going to be out of place because I'm only here for the appeal. Okay. What happens when we send it back? Now you have to proceed with respect to paragraphs 11 through 19 or so. You just cited the paragraph 19. I think it's 14 you meant. Maybe not. With respect to the allegations in the complaint against the bank that might put them on the hook. Might put them on the hook. Correct. But you've got to rely on conversations that took place between Mr. Joyce and the deceased individual. How are you going to prove this one up? Not solely that. Also conversations that took place between Mr. Joyce and the Hurley. Oh, and Timothy Hurley. Timothy Hurley. So they're both going to testify as to the intent of the deceased. I can't say that Michael will. I believe Timothy will talk about his knowledge. Do you think you're going to run into any problems with the Dead Man's Act at all? I think there could be. You think there could be? I think there could be, but I can't say that on this record, Your Honor. Okay. I don't know. You think there might be some other way when it's challenged you could establish those allegations contained in the paragraphs of the second amended complaint? There might be. Very honestly, Your Honor, it's not, as I say, I didn't try the case before. I don't intend to try the case now. Okay. But I accept your point. There is obviously, anytime you're talking about the intent of a decedent, you could have a Dead Man's Act problem. But that wasn't the basis on which the trial court was set. She dismissed it. However, now that we know she's dead, can we take judicial notice of the fact that she's deceased? There's no question about that. And do we read the second amended complaint? And remember, we review that. They know, but we don't really care why the trial judge threw it. Understood. I'm just curious. Oh, thanks. Anything else? I think we understand your position. I think you do, Your Honor. Your basic argument with respect to the second amended complaint is that these were not judicial admissions in the first amended complaint. Couldn't have been. That would have imperiled the second amended complaint. Correct. Okay. My problem is a very simple one. I don't see where there's a duty on the bank to make an amendment here. I don't see the duty. The court found that, alternatively, there was no duty. She indicated that. Correct. That is one of the many basics that she used. That is absolutely correct, Your Honor. I believe she was in error in that. Show me an Illinois case that would put a duty on the bank here. I would like to see it. That would put a duty on a bank that has voluntarily accepted a duty? Well, that's your argument, that Mr. Joyce voluntarily undertook the obligation. That he voluntarily undertook the obligation. Voluntarily accepting under this factual situation. There are cases cited in our brief which can define. I know every one of them can be distinguished from this case. I don't have an additional case for you beyond what's cited in our brief except to say. I've read those cases. A motion to dismiss, which is how this was disposed of. The trial court could not overlook the fact that it is specifically pleaded. That Ms. Busterski's fiduciary specifically told her it would do certain things that it then failed to do. A breach of fiduciary duty that is voluntarily assumed by a fiduciary. I don't believe it's a controverted question of law. It's a straightforward question of law. Thank you. Thank you, counsel. You'll be given an opportunity to respond to the bank, the charities, and the attorney general. Thank you. First, the charities. May it please the court, King for on behalf of the charities. This is the Feldman proposal, the investment proposal that brings us all together here. This might be fine investment advice to try to transform this. It probably was pretty good investment advice. She was cash heavy. She was cash heavy. But to try to transform this into a trust amendment, it simply does not work. It doesn't work for two basic reasons. One, it's contrary to 2BB, the Consumer Fraud Act, as interpreted by the Landhier case. And second, fundamentally, it simply does not meet the basic common law test for a trust. It's too indefinite. It doesn't spell out who gets what when. So as to our first reason, 2BB. 2BB. Which is the better one? The better reason? I think, well, we think they're both solid. But if the court wanted to avoid the Landhier case. The court? The trial court relied upon Landhier. She gave them the benefit of the doubt. It could be, she said. It could be characterized, given the context of this case, I guess, that an amendment, an intended amendment to the trust. But like Justice Cahill pointed out, we're reviewing this de novo. So go on and tell us why they're both solid. Well, I would say that the Landhier case stands for the proposition that there is, here there's no dispute that the Feldman proposal was not prepared by a lawyer. And it was prepared by Mr. McNamara, who never spoke to Mrs. Bisturski. He had no idea he was preparing a trust amendment. And Landhier is very clear. A trust amendment prepared by a non-lawyer is not valid. The Hurleys attempted to distinguish Landhier in a number of ways, but none of these were convincing. First, they argued that because Mr. Joyce of LaGrange delivered the Feldman proposal to Mrs. Bisturski, this fits within the bank exception of 2BB. Well, this stretches the statute to the breaking point. 2BB talks about the assembly, the drafting, the execution. No one at LaGrange prepared this document. And LaGrange never asked anybody at Feldman to prepare this document. Why would they? Why would a trust department at a bank look to an investment firm to amend a trust? They're not in the business of doing that. So Mr. Joyce delivering this document to Mrs. Bisturski didn't somehow magically transform it into something lawful. The Hurleys also argue that because the son had something to gain in the Landhier case and Mr. McNamara didn't, that that somehow distinguishes it. This reads into 2BB something that's simply not there. The Landhier case didn't rely upon the son being interested. It relied upon the plain language of the statute, which says that a trust amendment prepared by a non-lawyer is invalid. 2BB is not ambiguous on this point. Because it's not ambiguous, there's no reason to engraft some disinterested draft or exception to the statute. 2BB is grounded on some fundamental public policy. That is, there's a good reason not to have non-lawyers prepare these trust documents. It's important for the settlers, but it's also, in this case, important for beneficiaries, such as these charitable beneficiaries who, for 12 years, have always been beneficiaries. And now, supposedly, this investment advice prepared by a non-lawyer is going to disinherit them from hundreds of thousands of dollars based on something drafted by a non-lawyer. That's the very kind of thing that 2BB was designed to address. Well, it certainly would require a bit of parole to prove it up, wouldn't it? Assuming that the document were docketed with the trust agreement and then the trust agreement was before the court and that document was there. He's going to argue that that document is sufficient to give all of the money to the Hurleys. That's correct. He's going to have to come up with some parole evidence, isn't he? He would have to... Somebody's going to have to interpret what nephews means. And that's why I think this... Somebody's going to have to go beyond allocation and go to specific bequests and say, how does this particular document amend the bequests that are already in existence in the trust? And that's the fundamental... So you're going to have to bring in more parole. Exactly. And that's where this... Looking down the road a bit. If we buy into everything he says, and now you're in front of a judge and the judge has got... it's about time to distribute all of the assets. And that's, Your Honor, I think one of the fundamental problems with this whole... You're darn right it is. They're not asking this court to interpret something. They're asking this court to basically... Rewrite the trust. Rewrite an agreement. Rewrite the trust. Based on parole evidence, most of which is out of the mouth of the dead woman. And in this case, it's important to remember how this is before the court. This is not on a motion to dismiss. This is summary judgment. And it's summary judgment in that the Hurleys had an affirmative obligation to come forward and to present some issue of fact. They would say, well, we've got some other evidence that's going to show you that this is how the allocation was going to really happen. That never... that didn't happen. This is summary judgment. So... Well, he would argue, in his defense, he would argue that you're getting the cart ahead of the horse. The first thing you've got to do is to get this adopted as a genuine amendment to the trust. Right. Then you face the issues that you might have with the evidentiary issues with respect to properly interpreting it and then integrating it into the existing document. So we would come back to that. What they're really talking about is rewriting a trust that has been in existence for 12 years based on some of this. Okay. So... And then finally, they talk about Mr. McNamara being a mere scrivener as a way to avoid the Landshear case. They say that he simply was a scrivener and... But this doesn't add up at all. If the son in the Landshear case was held not to be a scrivener, Mr. McNamara could not possibly be a scrivener. Scriveners take down other people's words. Mr. McNamara never spoke to Mrs. Besersky. So the circuit court relied upon Landshear and this decision can be affirmed just for that reason alone. But there's a second reason to affirm, and that is that this is simply woefully inadequate as a trust document. A valid trust, as the Supreme Court of Illinois has said time and again, requires definiteness. You have to have all the pieces there. The Feldman proposal lacks the most basic elements. This trust amendment is that all the other trust amendments that came before did what you'd expect. They said this is a trust amendment, we're amending the trust, we're taking out this piece, we're adding this piece, and it's an amendment. That's what all the other ones did. This one, it doesn't say anything about amending a trust. It doesn't even have the word amend. And this business about the assets going to the nephews, well, it could mean the grandnephews only. Maybe it means the grandnephews and the other nephews, the real nephews. They've always been included in the other trust amendments. And if you assume it just means grandnephews only, that means they get everything, the charities get nothing, which is completely contrary to Mrs. Bisturski's intent for some 12 years, that the charities always receive something. There's no evidence that would indicate that that longstanding intent was being overridden. And finally, this is what the circuit court pointed out. How do you divide these assets up? The first verified complaint here said, based upon the nightstand document, all the stock goes to Timothy. That would have to be interpreted as also an amendment to the trust. That was the first. Either that or it's parole evidence to flesh out what this one might mean. But this one, does it say, this is completely inadequate, if it fails to say who gets what? Who gets the stocks? Who gets the bonds? There's no way to tell. And so this is far too indefinite. We need to really move on. We've got to hear from the bank. And finally, I would just mention, as we say, this is simply not a trust instrument. It's the McLaren case held. Past practice is so important to look at to reinforce the meaning of a trust instrument. Here, all eight amendments were formal legal documents. There's no evidence that Mrs. Bisturski, after 12 years of lawyer-prepared trust amendments, decided she was going to look to an investment firm she never talked to to amend her trust. So when this is all put together, this Feldman proposal should be seen for what it is and not made to be something it's not. It's investment advice. It has nothing to do with a trust amendment. It's simply too indefinite. And it is nowhere near being an instrument within any recognizable meaning of that term. So we ask that the circuit court be affirmed on both those grounds. Thank you, Counsel. Thank you. Oh, the Attorney General is stepping up. Okay. I think I have this much time. Richard Hozniak, you're the Attorney General. You have as much time as you think you need. Thank you. I'll try to be brief. The Court has focused on what I consider to be the relevant issues, and so I just want to emphasize two interrelated points that I believe support the alleged validity of the Feldman Investment Recommendation Proposal as a trust amendment to the Bisturski Trust. And those are that it lacks sufficient specificity to meet the legal requirements for what could validly constitute a trust or trust amendment. And there is no evidence that Ms. Bisturski intended it to be a trust instrument, a trust amendment, when she signed it. And that is also a critical element of the law. They're both set forth in the Eichner v. Gross case by the Illinois Supreme Court, which I think sort of frames the analysis on these two points. And there really wasn't any testimony at all that would really focus on what she intended when she put approved. There is no direct evidence that she intended this to be a trust amendment by signing it, and there's circumstantial evidence that she had a general intent in the future to execute another amendment to her trust. She had a retained lawyer who was in the process of having discussions with her, apparently didn't get to the drafting stage. The elephant in the room is that the Herlihys are complaining of the unfairness that the lawyer didn't get around to doing that amendment before she died. But the court is really now being asked to take general intentions to do something in the future, we're not exactly sure what, and convert those into a change in this document to make it mean a trust amendment. And I think by analogy, it's important to keep in mind the principle that the role of the courts for contracts is to interpret them, not to make them for the parties. And I think that's essentially what the plaintiff here is doing. They're not asking the court so much to interpret this instrument as to make it a trust amendment when it really wasn't one, wasn't intended to be one, and doesn't have sufficient specificity to qualify as one. It really is, I think, as President Justice Cahill pointed out, there's nothing about its purpose, the document itself, or the surrounding circumstances that suggests it was intended to do anything more than set forth the investment recommendations of the trust investment advisor. And since Ms. Bisturski had the reserved power to revoke the trust in its entirety, the trustee sought her approval of this necessarily. You don't want to do something contrary to the settler's intentions and then have the settler revoke the entire trust and say, goodbye, trustee, I'm going elsewhere. So that's what all the evidence shows. And to try and shoehorn into this the proposition that she really intended it to be a trust amendment and it has sufficient specificity, I just don't think flies. Let me add one more point. Even though this was a decision on a motion for summary judgment, it really doesn't make much difference with respect to the court's interpretation of the Feldman proposal itself because the Supreme Court has said, even after a bench trial, a chancellor's interpretation of documentary evidence is entitled to de novo review. So we don't really need to look to whether there might be an arguable question of fact, could reasonable interpretations differ as to the meaning of this document, although I don't think those are there. This court could say it's documentary evidence, we decide what it means, without deference to any findings of fact, even if there were a trial, if we're looking just at the documentary evidence itself. So I want to focus on briefly then what's missing to satisfy the specificity standard. Maybe you could look to parole evidence to try and interpret nephews to mean grandnephews instead of actual nephews. But the circuit court focused on something else, which is who gets how much? Do we divide it equally? According to the bedside note, some would get the stock, some would get a fixed amount of cash. Do we look to that to figure out how much it's going to go, how it's going to be divided? This is an unresolved issue that can't be supplied by the court making a trust amendment for the settlor as opposed to interpreting one that the settlor supposedly made and eventually go to the nephews. Why doesn't the court fill in those if it's going to be making a trust amendment for the settlor? I'm trying to figure out how you'd get the bedside note of evidence in the first place. Well, I think the Dead Man's Act is a problem. But ultimately, you know, if it were reversed, I'm not sure what the evidentiary possibilities would be to the extent that there's no dispute about the authenticity that it's not coming out of somebody's mouth. But I haven't really parsed the Dead Man's Act problems here. I think, though, that those are the core problems with the specificity. And they play into the other issue. They highlight the other deficiency here. You took a position, did you not, on the bank's entitlement to attorney's fees? Did you not? If we did, I'm sorry that I'm not able to speak to that here with confidence. Another assistant attorney general handled this below. If the bank's counsel can. Okay, but you're not here to argue that issue one way or the other. I'm taking no position on that. I'm emphasizing these two points. We filed a motion to adopt arguments by the counsel for the juries, and we urge the court to affirm on those grounds that we mentioned. And I think that avoids statutory interpretation and remedies issues if the court can just rely upon those. Counsel, thank you for your input. Thank you. It's always good to have the AG in the courtroom. Good afternoon, Your Honors. John Brooks on behalf of the First National Bank of LaGrange. In their verified First Amendment complaint, plaintiffs allege that the decedent hired a lawyer, an attorney Boylan, to assist her with her estate planning, specifically to do two things, to change the trustee from what was then Bank One to First National Bank of LaGrange, and according to plaintiffs, to increase the share of the trust that they would get when the decedent died. Those were the things they pled in their verified complaint. You heard counsel? That was a verified complaint. It was a verified First Amendment complaint. You heard counsel say that something the bank wants is to interpret that as hiring the lawyer for all purposes and for all time. No, that's not it. For that purpose and that time, those were the two things they pled in their complaint that he was hired to do. By their own admission, he established the first one. Of course, he did. He decided to do it in two stages. He changed the trustees and later do another amendment to increase the share to the Hurleys. Judge, what about the allegations that when the transfer took place, there were meetings, were there not, between the bank and Mrs. Wisterski? Were there meetings or not? The bank representative and Mr. Joyce was in meetings. Correct. Didn't Mr. Joyce? Correct. Aren't the allegations, and I don't know that they were ever denied, aren't there allegations that, what's the gentleman's name? Joyce. Joyce. Aren't there allegations that Mr. Joyce promised her that they, the bank, would get the trust amended to reflect her desire to adjust the assets as to where they would go? No. The allegations were, depending on which complaint you look at. I was looking at the second amendment. The second amended complaint, it was dismissed for two grounds, and one of those was the court says on its face, we plead that it didn't state a recognizable cause of action under 2615. The court looked at it and agreed. And she agreed because even viewing that in the light most favorable to the plaintiffs in this case, if the bank agreed to make appointments for the decedent, which is what they pled, that she was without her lawyer. Now, they changed the story from the verified facts of the first one where she had a lawyer. She now no longer in the second complaint has a lawyer to do that, and so somehow it was the bank's job to make appointments for the decedent to interview lawyers. So you're saying there's no testimony, there's no pleading, there's nothing in any deposition anywhere on file that suggested that the gentleman from LaGrange told her that they would prepare or make certain that her trust got amended to reflect her wishes? No, there was certainly no promise to amend a trust. In fact, that's the way we get the first amended complaint dismissed, in part, was because there was a statute. What is it pled that they said they were going to do? You tell me. In the second amended? Yeah. In the second amended, they pled that the bank had a duty to make appointments based on statements that they would assist her in what she needed to make appointments with attorneys if she didn't have one. And, of course, in the second amended, apparently Mr. Boylan dropped out and they said she no longer has one. The court found that even viewing that in the light most favorable to them, if the bank had agreed to make appointments to find an attorney for the decedent, that wasn't the proximate cause of plaintiff's damages here. There is no guarantee that the bank could have controlled the outcome of what the decedent and her new lawyer, assuming she hired one, would do. I think there's also an element of reasonable reliance in that, whether a person could sit there month after month and say, well, where's this lawyer you promised to send me? But she said, Judge Pantley in the circuit court said, that the harm was not certainly caused by any failure to make appointments, that the harm was a lack of an amendment to the trust, that the bank couldn't control the outcome or control what she and any lawyer did. Frankly, they pled that she had a lawyer in the first amended complaint. You have to get by that. In fact, counsel, when he first stepped up, his comment was, she informed her lawyer of her intent. The second amended complaint was dismissed for two reasons. One was the judicial admissions in the first, from which Judge Pantley said, I don't see how you can now fashion any set of facts that would put forth a cause of action. Against the bank. Against the bank. The bank couldn't draft a trust amendment pursuant to statute. And while we're there, let me just address the statute for a second, because people like to focus on 2BB. Well, his argument basically is that Mr. Joyce made an undertaking. He voluntarily undertook to obtain somebody who would prepare the appropriate document. Forgetting, again, about the verified statements, that she already had a lawyer. That was pled specifically and numerous times in the first amended complaint. And that's why Judge Pantley throughout the second amended basically says, we're going to strike the inconsistent allegations with what you verified in the first one. Now we're left with your first story. The bank can't draft trust amendments. And I'm referring to the Illinois Corporation Practice of Law Prohibition Act that specifically prohibits the bank from drafting any kind of legal document. Can they obligate themselves as a fiduciary to – first of all, are they fiduciaries in this context? They were the trustee of the trust after she signed her letter. So we know that. So they do have a fiduciary obligation to her. And if they make her a promise that they're going to get her a lawyer that will prepare the document that she wants prepared, doesn't that put them on the hook? That was not alleged. First of all, that wasn't alleged. Second of all, the verified complaint said she had a lawyer. And his own affidavit prepared by the plaintiff's counsel, he says, unfortunately I never got around to drafting that second amendment. The second amended complaint, they abandon those facts to try to get around the first ruling and say she didn't have one and the bank undertook to make appointments. And that Judge Pantley also had a problem with, and she said, that's not the proximate cause of your damage, even if they said that. Okay. I think I understand your position now. What about these attorney's fees? Attorney's fees. Bank filed a motion following dismissal of the complaint with prejudice asking for a ruling. In 304A language, they got it. I was coming back to that. Yes. We did file a 304A. We also filed a motion after that, more than 30 days after the 304A ruling, requesting a ruling on two things. Was the bank entitled to any reasonable fees? And if so, whether they came from the trust as a whole or from plaintiff's shares. This was just a preliminary motion. That's where the AG got involved. Didn't he support you in the argument that you made that the money ought to come out of the Hurley Heed? Correct. And not from the charities? At least the charities did. I think perhaps the AG did as well. I may have misread the record. I thought it was the AG who was supporting your position. Maybe not. That motion sort of became the subject of some cross motions of other people saying, I'm entitled to fees as well and they should come from your share and so forth. These were all very preliminary motions. The point being, after the 304A ruling and 30 days it expired, the court didn't think it had jurisdiction to hear our motion. We don't see that motion as a post-judgment motion under 1203 or a sanctions motion under 137 that would both have a 30-day window. The case was continuing with multiple parties. The bank felt it had a vested interest in this. The panel took the position, though, that you blew it in terms of jurisdiction because you didn't file it within 30 days of the 304A being filed. That's correct, Your Honor. What case did she rely on for that? She really didn't cite a case for that. I didn't see her relying on a case for that. But she did say she didn't have any jurisdiction to entertain your feedback. That's absolutely correct. And let me just add it was not a case. Isn't that what Brewer says? That was not cited in her opinion and I don't believe it's been cited. Well, we decide whether the jurisdictional issue was properly decided. That's at the noble review. Our position was that the case was continuing. We had an interest in it. It's not a post-judgment motion. It's not a sanctions motion, both of which would have a 30-day window. We think it's a separate claim within the meaning of 304A in the Prince and Marsh cases. Also, I'd just like to add there was an objection by plaintiffs to this. We're not even sure plaintiffs had standing because there's been no ruling that even if the bank were awarded fees, it would come out of their share. As things stand, all they got was a pecuniary gift, and the general rule would take the fees out of the trust as a whole or the resident. So whatever their objections are, I'm not sure they should have standing for. But what they criticized us for was not submitting evidence, in other words, the usual timesheets, affidavits, narratives, and so forth. But what was filed was a very preliminary two-page motion saying are we entitled to anything, and if so, where does it come from? In fact, a similar motion was filed by the charities and also by the plaintiffs. We attached them to our papers. Nobody even asked for a specific dollar amount. These wouldn't have been final appealable orders if they were granted. So we don't think that, and I think it's a little disingenuous when they filed the same thing and nobody had any evidence. The court below denied all the motions, frankly, and didn't say a word about evidence. I think that tells you that we just had not gotten to that point. Obviously, if she didn't have jurisdiction to consider it, she wouldn't have considered any evidence. No, but she didn't talk either in the other ones either. It was a purely jurisdictional dismissal as far as I could tell from what she said. That's absolutely correct, Your Honor. I don't have any more on that. Is there any more on the bank's undertaking or anything that I can answer? Okay. Counsel, you get the last word. First, as to the charities, as much as they try to denigrate the May 13th document, they never deny that it complies with the plain amendment provisions of the trust itself. They want to put all of these other provisions on there, but what controls is what the trust says about amendments. Now, they say that it's not clear enough, but that completely ignores the Whitaker v. Stables case that they don't even cite in their brief where we have a trust amendment for a document that doesn't even exist anymore. Testimony about a document that once existed that says, Dear Carol, I love you very much and I want your brother to get your father's share. And according to the testimony, it was signed, quote, something like love mom. That was an amendment to a trust. And they say that this particular amendment, which is far more clear, doesn't qualify even though that amendment qualified in Whitaker v. Stables. And we actually have the document in this case, not just testimony about the document. Finally, the charities suggest to the court that Ms. Pastersky wouldn't have looked to an investment firm that she never talked to to accomplish an amendment to her trust. And they're absolutely, completely, totally right. She didn't. She looked to LaGrange to do it, and LaGrange did it by presenting her this document, admittedly prepared by the Feldman Group, but she didn't deal with the Feldman Group. She dealt with LaGrange, and she didn't know who prepared the document. It was given to her by LaGrange. LaGrange discussed it with her, asked her to sign it, and that's the document that says the assets go to the nephews. The Attorney General suggests that the record tells us that Ms. Pastersky all along was talking with her lawyer, Mr. Boylan, about amending this trust at all of this time period, up through and including the May 2002 period when this Feldman Securities document was signed. But I want to correct that. There is absolutely no evidence of record that in May of 2002, Ms. Pastersky was talking to Mr. Boylan about amending the trust or anything else. Mr. Boylan is no longer in the picture as of May 2002 as far as the record discloses, and why would she be talking to him? LaGrange Bank had already assured her that it was taking care of everything to accomplish her wishes with respect to the trust. And so I'll move on then to the issue with the bank. Finally, here at oral argument, the bank admits what we've been saying all along, that Ms. Pastersky hired a lawyer for that particular purpose at that time. But that doesn't make Boylan Ms. Pastersky's lawyer forever. That time was back in February of 2002. By the time May 2002 rolled around, the date of this amendment, Boylan was no longer in the picture. The fact that she hired a lawyer in February doesn't mean that she necessarily still had that lawyer in May, particularly when we never alleged that she did, and we alleged that LaGrange had told her it was taking care of everything. Now, Justice McBride asked the bank's counsel the question, aren't there allegations that the bank promised to take care of the amendment or promised to do what was necessary to carry out her wishes? And the bank's attorney, here we go again, says the undertaking was to make appointments to interview attorneys. And other than that, there was no promise alleged. Well, let me read the court, if I may, paragraph 19 of the second amended complaint. Pastersky stated to Joyce during meetings in February that it was her wish that all of her stocks be bequeathed to Timothy or gifted to correct both the immediate investment concerns, the imbalance of the trust assets that would default into the residuary clause. Here's the key point. Joyce, the bank's representative, replied on at least two occasions to Pastersky and Timothy in February that her directives to bequeath or gift all her stocks to Timothy to avoid the residuary would be accomplished as she intended and that no further steps would be necessary on her part. This is not an undertaking to make appointments. This is an undertaking to get her wishes carried out. Thank you. Counsels, thank you all. The case will be taken under review.